Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. Please be seated. Welcome to the United States Court of Appeals for the Fourth Circuit. It appears we have a full house. If I'd known that, I would have been selling tickets outside. I guess you all will have to stand. The law clerks, if there are law clerks standing, you might want to just go back to chambers and watch remotely, rather than stand there in the middle of the aisle. We have two cases on for hearing, 24-1465 Scharpf v. General Dynamics Corporation. We'll start with that one. Mr. Cobbs. Good morning, Your Honors, and may it please the Court. My name is Robert Cobbs, from Cohen Milstein, and I represent the plaintiffs Susan Scharpf and Anthony DiArmaggio. According to multiple independent witnesses with personal knowledge of the facts, the defendant shipbuilders and engineering consultants maintained among themselves a secret, unwritten, quote, gentleman's agreement not to poach one another's naval engineers. This agreement is a classic market allocation conspiracy that is per se unlawful under the antitrust laws. As might be expected of an unlawful conspiracy, defendants took steps to prevent its discovery by plaintiffs, class members, government regulators, and antitrust enforcers. From at least January 1st, 2000 to the present, defendants' executives and senior managers used verbal, in-person, and telephonic communications to strike, discuss, and enforce their conspiracy to avoid creating a trail of written and digital evidence. They used euphemistic code words to sanitize the conspiracy in discussions among themselves and with others. This is all well and good, but the question in this case that you're confronted with because of what you're describing is a question of do you make that first element of fraudulent concealment? Correct. I know there are cases on it, and we might as well cut to the chase on it. You've got Moliton, you've got Pocahontas. Why don't you address that because that's a critical question in this case. Is this conduct or is what was done sufficient to meet that first element? You've got case law that's all over the place. I don't think that's correct, Your Honor. I think the case law divides very neatly down a line that is, is this behavior concealing or is it not? I would expect you to say that. Yes, sir. And by behavior, do you mean what you just described different from case law suggesting that lying or failing to acknowledge wrongdoing is not enough? You think you have more here? Absolutely. And what, what is the more? Well, so, uh, um, to start with, we had, you can see that just lying or failing to acknowledge wrongdoing wouldn't be enough. Absolutely not, Your Honor. I don't think, uh, I think no court in the land says that a direct lie to a person who has a cause of action, uh, is not an affirmative act of concealment. I think there are a lot of courts who reasonably inquire kind of at the second step of the fraudulent concealment. Was that a direct lie in Pocahontas? No, I don't think it was. Right. I think it was, it wasn't the truth. I think the point of Pocahontas is that the, um, uh, the inquiry that the plaintiff made to the defendant, uh, you know, why aren't you taking my shipments of coal? Well, there's a train strike on, uh, why is the price of coal so low? Well, that's the contract price that you agreed to that those answers to this kind of timid inquiry read as just normal answers and don't indicate an attempt to conceal a conspiracy. In contrast, right? If you in the a, you know, complex conspiracy to drive me out of business in this valley. Uh, and the defendants had like knowingly said to them, no, absolutely not. You're crazy. I think that's, uh, certainly an affirmative act of concealment. I think then you get to the second step question of, uh, was Pocahontas on inquiry notice in the first place and was there inquiry, uh, uh, was it reasonable to rely on that lie? And I think Pocahontas on undisputably answers that question. No, you can tell if you look at section five of that case, which is a state law claim. Uh, the state law claim works under a discovery rule. So no affirmative acts are needed, uh, but they dismiss it under the inquiry question anyway. Do we have any kind of inquiries like that in this record where people asked affirmatively and, and, um, the defendants outright lied? No, sir. Because the, uh, well, I think the, uh, we have public misrepresentations as to the competitiveness of the, uh, of their hiring processes, but that's not about inquiry. It just seems odd to me that you would suggest that these, these folks should fall on their swords and every opportunity to say, well, we did it. Sorry. It's on us. That's exactly not what we alleged. So what are you saying that they did beyond that? So, uh, they used verbal and, uh, kind of in person and telephonic communications to, uh, uh, to manage the conspiracy specifically for the purpose of avoiding a paper trail, right? The, well, that's the very definition of a unwritten agreement, right? So are you saying that every unwritten agreement is a fraudulent concealment? No. Uh, like if I go to a convenience store and I buy a candy bar, we don't write down, uh, the transaction. That's an unwritten agreement. Uh, but in the context of a multilateral conspiracy among competitors, uh, not to poach, um, each other's employees, uh, the intent to conceal becomes very clear. Particularly if you consider, uh, if there were no concealing purpose, would these competitor companies reach a multilateral agreement with, you know, exceptions and things like that without writing it down? And the answer is unequivocally no, right? When, when these companies work together bilaterally on a contract, on a contract, they have complex written agreements. And I think particularly at the motion to dismiss stage where inferences are, uh, uh, favor us, uh, the fact that the conduct is not written down, uh, and that we have witnesses who, whose phrasing indicates that the, the not writing it down was the point, right? We have witnesses who, who described the, uh, the agreement as non-ink to paper, which I think goes beyond just like an agreement that happened not to be written down and toward one where the purpose of the writing down is to avoid leading a paper trail. That seems more sinister than somebody affirmatively stating that they're not going to write it down. And by definition, I think most conspiracies, at least those that make any sense, you're not likely to publicize, Hey, we're doing here is wrong. See what I'm doing. It's all wrong. Well, it took, it took an extensive investigation to find the witness that was willing to tell us that your honor, they didn't volunteer that to anybody. Um, I think so apart from, and also to be clear, the, this kind of behavior, uh, this kind of avoiding a paper trail is routinely found to be affirmative acts of concealment, even in, uh, jurisdictions, uh, in circuits other than this one, uh, the ninth circuit for instance, does distinguish between active and passive conduct and nonetheless courts there routinely recognize that keeping something off the books, not writing it down, uh, um, in animation, uh, workers, for instance, they found that, uh, affirmative acts on the basis of testimony that the reason the agreement was termed a gentleman's agreement was because it was not written down. So you would say an omission can be an affirmative act. Of course, of course. Uh, and I think the, uh, Marlington specifically rejects, uh, any distinction between active conduct and passive conduct resting, recognizing that you always have a course of conduct, right? The question is whether your course of conduct indicates an effort to conceal the conspiracy. And I don't think defendants have any, uh, basis on which they can say, we don't have that. We have witness testimony saying we struck this agreement. Uh, we didn't write it down. Uh, we allege they, um, uh, passed on instructions about the conspiracy only verbally, uh, to their subordinates. Uh, we allege they attended in person meetings at, uh, conferences and events to avoid, uh, suspicion. Um, uh, kind of going back to other cases right in Jian, uh, affirmative acts were found in keeping meetings off the books, uh, and in-person attendance at these meetings to avoid leaving a paper trail, uh, in capacitors, which we cited below, uh, there were affirmative acts, uh, because the defendants did not take or distribute official minutes or record, uh, in vitamins, which was cited in the COSAL brief in DDC, uh, avoiding references and documents. These are all affirmative acts of concealment. Uh, and they, they recognize that, uh, that what matters is whether the conduct is concealing. And that fits Judge Wynn with your kind of outlining of the purpose of the fraudulent concealment standard. Uh, in Edmondson, you quoted Judge Motz saying the purpose of the fraudulent concealment doctrine is to ensure that wrongdoers are not permitted or encouraged to take advantage of the limitations period to commit secret illegal conduct without penalty. Quoting Judge Motz always seemed to be a good thing. Yes. Um, here it's clear that we've alleged secret illegal conduct that wasn't revealed to the plaintiffs. And the purpose of the statute is to reach out. One way you can tell is you wrote a note in Edmondson, uh, where you said, well, let's say hypothetically that the, um, uh, the stricter equitable tolling standard applies, uh, which requires extraordinary circumstances, um, uh, uh, and circumstances that would make it unjust to apply the statute of limitations. And you noted that even if that applied to the fraudulent concealment in Edmondson, uh, uh, defendants, affirmative efforts to conceal the, uh, cause of action from a blameless plaintiff are extraordinary circumstances. These plaintiffs could never have brought the case because they weren't on inquiry notice because the defendant could feel defendants concealed the conspiracy. Wasn't there a lot more going on in Edmondson than what we have here? They had affirmative evidence of sham entities being used to conceal. Um, and I know you argue that the, the so-called legitimate agreement of no poaching on projects was essentially a sham. Is that your, your argument that that's the equivalent of what in Edmondson was a, was a use of sham entities? Yeah. I mean, so sham fraud and equity are all, uh, kind of doctrines that depend a lot on the and context, right? What is a fraud in one circumstance, uh, is not once you, or is not fraud like normally, right? You can shred your bank statements, uh, to protect your privacy. And that's like good practice. But if you are shredding your old bank statements to like cover up your years of embezzlement, that's concealment, right? Um, and no two conspiracy, no two kind of fraudulent concealment things are the same, except I guess the, the string of cases involving genuine title that, uh, that were presented in Edmondson. Um, you know, in each circumstance, the, um, exactly what the defendants do, uh, exactly what witnesses tell the plaintiffs or the DOJ investigation or FTC investigation uncovers, uh, you know, people conceal a conspiracy in different ways. But I think what, what judge wins kind of careful exposition of the fraudulent, of the equitable standards, uh, in Edmondson reveals is the, the, the central core of fraudulent concealment is equity. It's justice. And our plaintiffs have no, they weren't sleeping on their rights, right? They never, uh, you know, they didn't not ask questions. They didn't, um, uh, uh, otherwise, uh, um, uh, sleep on their rights. Uh, justice requires that they be allowed to pursue their cause of action for this unlawful conspiracy. I have a question about rule and nine B. And so, you know, and I understand and recognize and acknowledge that it may be difficult to comply in all respects with the requirements of rule nine B, the who, what, when, where, why and how, because of the nature of the allegations here. But I mean, there is an obligation nonetheless. And I have a concern as to whether or not you've complied with that. So tell me why you think you have. Sure. I think in the first instance, we did plead who, what, when and where we pled an incestuous community of executives and senior managers, paragraphs one, four, 11, 12, 1 35 to 1 39. But that's, that's pretty generic. You didn't sure. Well, no, it's, it's quite specific. Defendants know who their senior, uh, managers and executives are. Um, we don't know the names of all of them. I mean, it's a company. There are a lot of senior managers and executives. How would they know who? Well, uh, the, I mean, it's not that big a universe. Uh, the, um, uh, um, the senior managers in charge of hiring naval engineers and executives is a pretty universe, limited universe at these companies, we think. Uh, and certainly over the course of 20 years, they're bound to be a significant number of them. Uh, but the, uh, I guess more importantly, the, what we're alleging is a course of conduct that the defendants as a group maintained over the course of a quarter of a century. And quarter kind of attacks a similar, uh, um, a similar circumstance. So in quarter, if you remember, uh, the defendants were of alleged to have left crucial information off of royalty statements in a series of leases, uh, over the course of, I think about 25 years. And, um, uh, quarter says, uh, no, look, we're not asking you to plead each royalty statement that is misleading. It's enough to plead when it started. Uh, uh, and, um, uh, and that it was involved in these leases where the quarter plaintiffs failed is that they, their allegations were fundamentally ambiguous as to what the claims were, which like set of leases they applied to and which defendants they applied to. That goes back to the, the standard that was laid out in Harrison versus Westinghouse at first, uh, that looked to the purposes of the, of rule nine B particularity, which are to put defendants on notice of, of the conduct that's alleged, um, to prevent strike suits, to prevent fishing expeditions and to protect the reputations of innocent defendants. None of the purposes of rule nine B are to prevent meritorious cases from going forward. And so when you ask what level of particularity is required, do I need to name each individual senior manager? Do I need to, uh, articulate, do I need to ask this witness who spent 25 years in the industry, uh, to name a particular circumstance where they, uh, use the phone. That's not how witnesses work. We have this witness who says, yeah, if somebody hired one of my guys, they would call me up and say, I didn't poach him. And like, that's the way witness memory works for a pattern of conduct. Uh, they recall how they did it, right. I, you know, if you asked me if I drove a car five years ago, I don't know. I mean, I, I drove a car generally, but on any particular day, I don't know. Um, so the, the question of how much particularity is required depends on, do you satisfy the purposes of rule nine B are defendants on notice of the conduct alleged? Uh, and is there enough evidence to show that we have substantial prediscovery evidence or claims that this isn't a strike suit or a fishing expedition? And I think we unquestionably do. Eyewitness testimony establishes that. All right. Thank you, Mr. Cobbs. Thank you. Mr. Hellman. Thank you. May it please the court. I'm Matthew Hellman on behalf of the shipbuilder police. Plaintiffs brought these claims a full 10 and 19 years after they left the shipbuilding industry. And as the district court recognized, those dated claims are doubly time barred for much of the reasons that we've been discussing this morning already. They're time barred because this court and others uniformly hold that alleging an unwritten agreement is insufficient to obtain equitable tolling. And that's enough for affirmance by itself. And judge, when I'd like to talk with you about the cases on that point, because I heard your question to that effect and they're independently barred because of rule nine B plaintiff's allegation of concealment has none of the detail that rule nine B requires, let alone for an allegation of a 20 year conspiracy involving 17 different defendants. There's no who, what, when, or where in this complaint, just a bear assertion that an agreement was unwritten, not even an assertion that anyone told anyone don't write it down, destroy something, not even a general assertion of that, let alone any particularity. So if I could, I thought they did allege that by definition, a gentleman's agreement was something that was not written down. They do allege that the agreement is unwritten, but what they do not have is any allegation that someone said, don't write it down or even at a general level or destroy something. And if I could, when it comes to unwritten agreement allegations, which is what we have here, there's a lot of law on this from this court and from others. You've got the Robertson case, which is this court's precedent holding that allegations that the defendants met secretly and were told not to discuss the agreement insufficient under rule 12 B animators, avoiding memorializing the scheme and writing insufficient towers, quote secretive gentlemen's agreement insufficient SD three secret meetings of reasons insufficient Ryan V Microsoft avoiding disseminating information insufficient pools products, secret meetings and communications insufficient refrigerant compresses instructions not to record quote clandestine meetings insufficient. All of those cases apply the same affirmative act standard that this court applies. And all of them hold that alleging that an agreement was unwritten does not satisfy that standard. So this court would be going against Robertson, which is, you know, obviously a post Marlington authority from this court in holding that an unwritten agreement is enough. And Judge Tranga was, you know, catalog canvas those cases and came to exactly the same conclusion, applying the affirmative act standard to conclude that alleging an unwritten agreement is not enough. Robertson had a footnote in it that basically had that dismissal part in it. So it seems like the holding was in a footnote in Robertson, and it also seems like it went more to the question of failure to inform than it did the secret meetings. How do you respond to that? So I think Judge Wilkinson's footnote said the district court got it right when it held that this was not an affirmative act under this court's case law. I put in a footnote. It's so important. I mean, it seems like footnotes are kind of a little side thing. You say he's not really holding in a case. I know the Supreme Court does it all the time. They do it. We treat it with a lot of respect. But when we throw something in a footnote of this level, it's kind of difficult to elevate it as though it's the actual holding that you're bound by. Well, two points on that. It was clear and expressed. He did put it in the footnote, but he said what he meant or the court said what it meant. So that's the court's most recent statement on this, and it's directly on our side. And then two, it's consistent, as I said, with this litany of cases, all of which come to the same conclusion. That's not a hard question under the Affirmative Acts case law. All of these cases come to the same conclusion when it comes to unwritten agreements, allegations of secret meetings, etc. So you have all of that on one side. And does shredding of documents constitute an affirmative act? So I think shredding of documents might well constitute an affirmative act. Things like in Marlington. In Marlington, did it address to some extent Marlington's distinction of one can shred a document or one who carefully abhors creating a document? Right. So Marlington does talk about shredding documents in the passage that you're talking about. But what Marlington is doing is not alleging the sufficiency of any particular allegation. That was a summary judgment case, not a rule motion to dismiss case. And what it says is, under the Affirmative Acts standards in that passage that you're referring to, you've got to have an affirmative act. And we, the court, are not going to try to parse whether that act is part of the conspiracy, not part of the conspiracy. We're not going to go through that inquiry too hard, not worth the effort. So the court says, we'll adopt the Affirmative Acts standard. That's the same standard that animators, towers, SD3, Ryan V. Microsoft, pools, refrigerants, those all apply that same. What about Edmondson? I've noticed that you have not cited that case. How is this case different? Sure. So Edmondson is the 9B case. And this case is night and day from Edmondson. So here, the allegation is an unwritten agreement. There's no allegation that A told B not to write something down. B told C destroy something. Even D told E, let's keep this off the books. None of that's here. Edmondson is, I feel like it's just right on the other edge of the spectrum, both in terms of detail in the complaint and what's alleged. Kickbacks, false companies, fictitious enterprises, that sounds like fraud. And I understand that Judge Wynn wrote that opinion. We've got no quarrel with Edmondson. In fact, Edmondson, what it says is you got to give some details about the who and the when and the where. And that's an entirely separate mountain that this complaint needs to climb. It fails out of the gate, to mix my metaphors, on the- What about, they allege that the posting of fraudulent information regarding job postings. So it's interesting. That kind of allegation is in the complaint. They barely talked about it below and in this court. And I think there's a reason why. Cases like Garrison and really Pocahontas, I don't think it's consistent with Pocahontas, all say that that kind of general statement, general statement is not sufficient to constitute an affirmative act. And I think if this court were to break with all that precedent, say Garrison, Pocahontas, it would basically be saying that every 10K, every annual report is an excuse for decades worth of tolling here. And no court holds that. And I think, again, this is a reason why that occupied very little of their briefing on appeal. But I want to go back to the 9B point, Judge Benjamin, as well, and Edmondson too, because I do think this is- What the plaintiffs are arguing here, and when you look at their complaint, I want to be very clear about what they allege and what they don't allege. They allege that the agreement was unwritten. But I feel like my friend on the other side keeps on suggesting that there were acts of concealment that are alleged. There are no acts of concealment alleged in this case. It's not there's no allegation that someone told somebody else not to write something down, destroy it. Those kinds of allegations are just missing. And the fact that they're not even there at a general level is enough to affirm. But Rule 9B, we're talking about 17 defendants over 20 years. And we're also talking about- my friends on the other side say it's a very long complaint. It is. They say that they engaged in a very long investigation. We'll take them at their word for that. All of that does not yield a single allegation of anyone telling anyone to conceal anything. Well, I guess there's two possible reasons for that. One, there wasn't any such agreement. Or two, your clients were quite good concealing it. And so the question is, why should the defendants benefit from that kind of activity of concealment? Well, if I may, Your Honor, there was no such agreement. But the very premise of the question is, why should defendants benefit from some act of concealment? There is no act of concealment alleged in this case, let alone with particularity. They do allege the agreement is unwritten. But they don't allege the things that you would normally expect someone to come forward with, even at a general level, that it was unwritten because somebody told somebody to keep it unwritten. It was unwritten or it was hidden because of destruction of evidence or something like that. They don't have any of that. And again, I recognize this isn't a footnote, Judge Winn, but if you look at the allegations in Robertson, the allegation was that the defendants were told not to talk about their agreement and they were told to meet secretly. We don't even have that level of allegation in this case. And Robertson said that that wasn't even enough under the Affirmative Act standard that Pocahontas, Marlington, and this court talks about. So let me ask you, if the agreement had been in the writing, that's a violation, that's a problem, right? If they'd actually had a written agreement saying that you had to keep down the salaries or make sure there's no competition, you can't do that. So the question that I have is, if you know that you don't, if you don't write it down, you won't face a consequence, why would you ever write something like that down? Why wouldn't you do what is alleged here? And that is to say it orally or to just have this, quote, gentleman's agreement. And where is that line drawn as to when and how do you, I mean, the very nature of a gentleman's agreement is to keep you from flying out about it. So those very things that you seek to have the particularity, that's the aim. So that you will not be able to state with particularity, I'm doing it, but what you do have is the result. And you see these results happening over and over again. And yet we're in the trial process and you would think, well, maybe not, but at some point in time that doesn't mean it's the end of it. It just goes on. So there's proof and you ultimately can determine these things. But I wonder, wouldn't you be incentivizing conduct that would allow you to do something that you cannot do, particularly if you put it in writing, in other words, you can do it, you're doing it, but you just didn't put it in writing and put it in kind of form that it can be easily seen. And who would? Because they got great people who work with them, great lawyers who represent them. You would say, you don't say that. But if you're at the country club or you're on a golf club, of course, you can kind of talk and say, well, I know that didn't actually happen here. It may not. But you have this, quote, gentlemen's agreement. I guess we continue to call it gentlemen's, not woman's agreement, but that's okay. But the point being, you're doing it and there's enough information here to say there is some concealment here going on, but the very purpose for which you were doing it, you're winning because you didn't state it with any level of particularity. Yeah. Yeah. So maybe three comments on that, Your Honor. So one, the cases that address this question go our way, but as to why they go our way, let me say two things in respect to that. The case that addressed the question I just posed? I mean, I understand there are cases. I know we got Moliton. We got cases all over the place, but I'm talking about the specific situation and I'm saying the incentivizing of not doing something, because if you do it, it's going to indicate you are violating, but you can get the result by not doing this particular thing. That's what I'm getting at. Yeah. I understand that. Let me do my best to respond. So one point is there's not even an allegation, and therefore this incentivizing point that you're making, that A told B don't talk about it. We don't even have that kind of allegation in this case. But that's kind of what you get from gentleman's agreement. That's sort of a term of art, seems like to me. Gentleman's agreement is just that. I mean, it's between us. Right. But I do think my friends on the other side are sort of pushing that point, but of course, that would mean that every unwritten agreement gives you perpetual tolling, and that's just not where the cases come down. But the second point I want to make is- Well, if the unwritten agreement would seek to do something that you couldn't otherwise do, if you wrote it down and it was illegal conduct, what would be the problem with tolling then? I mean, if you can't do something and you don't write it down, so it can't be any proof that you did it, but you do it anyway and use a different method. So even with unwritten agreement, meaning all agreements or whatever you want to call it, what would be the problem with having that tolled? Well, because it's the same thing. You just didn't tell it. Right. And so Rule 9B and the Affirmative Act standards are trying to make sure there's some indicia of reliability and specificity in the complaint, and that's why you do need to have that allegation of A told B not to write it down. But if I could, there's a second point I think that's responsive to your questioning. The reality is these claims could go forward tomorrow if they were brought by a plaintiff who was in the industry now as opposed to someone who left the industry 20 years ago. Those claims would be meritless. Judge Wynn, you're talking about agreements and secrets. No secrets, no agreements. Those claims would fail on the merits. But these claims with these plaintiffs who left the industry decades ago fail first because they're so old. So if Judge Wynn, if you're worried about incentivizing or trying to carve out an exception to what we think is a pretty uniform line of cases in this area, this is not the case to do it. It's at the extreme end of lack of detail. It's at the extreme end of being dated. And it's at the extreme end of simply alleging an unwritten agreement. What if it actually happened? What if it actually was a gentleman's agreement and these individuals, no matter how long ago, they had in fact suffered this wrong and now you have evidence of it going on, you don't mean to say that just because it's an old, something happened many years ago and you find evidence of fraudulent concealment and you find that it fits within this category where it was concealed in a way affirmatively, you don't mean those cases aren't cases that you possibly couldn't go forward, do you? I think what I mean is the following. The Rule 9B case law and the Affirmative Act standard give us a dividing line between what can go forward and what can't go forward. These allegations are well short of what could go forward under that case law. And I just wanted to emphasize that if someone is saying, well, how could we ever pursue, you know, we need to be able to pursue these claims. The reason these claims aren't pursuable is that there is no one in the plaintiffs here who have no particularity, dated claims, and those are the plaintiffs before the court. So whether we're talking about the case law, which says, again, all those cases hold unwritten agreements, not sufficient, and they require some who, what, when, and where. I think I heard my friend on the other side say, you know, managers. Well, which managers? Which companies? None of that is expressed. There's no allegation whatsoever when it comes to concealment as to who did what. Those allegations simply are not present, even at a general level. So, and I think this is what you're saying, and correct me if I'm wrong. The first point is that for better or worse, our cases say that the self-concealing standard isn't enough. We need some affirmative acts. Yes, like most courts say that, yes. And we don't have that here. Right. And second, I guess with respect to the, you know, the equities of allowing a claim to not be able to be pursued, and I know we're not getting into this because I don't think the district court resolved this issue, but there's the question of diligence, right? There's got to be some diligence on the part of a plaintiff, notwithstanding how long a claim may be, you know, may be secreted. They've got to take some affirmative acts and diligence to uncover the wrongdoing. That's correct, Your Honor. And of course, there's zero diligence alleged in this case. And so, and then I also, to your duo, I would add a third member, which is just the 9B aspect of the case, which is that there is so, not even on information and belief, they're asking to go back 20 years to that and conclude that there were acts of concealment when no act of concealment is alleged, even at a general level. That's why I say there could be different cases where more is alleged. This court can reserve pretty much anything under the sky and still affirm in this case, because the allegations of concealment are so thin here, or non-existent. In my remaining time, I just want to say a word about the teaming arrangements, just because I think it came up before. Let me say a couple things on that. Again, it's both an Edmondson problem, Judge Benjamin, and a 9B problem in particular. Teaming arrangements are encouraged by the United States government to build military vessels. Those are not kickbacks. Those are not sham companies. Those are things that Congress has said, we want these things. There is no allegation here about which teaming agreements anybody ever saw, anybody ever thought about. It's just put out there as a general matter that these legitimate, congressionally approved agreements somehow were responsible for the concealment in this case. These plaintiffs don't even allege that they were aware of any such agreement. It's 2004, and Mr. D'Armento is leaving the industry. He's got to say, I didn't bring a lawsuit within four years because, well, he doesn't say that he ever saw a teaming agreement or ever thought about a teaming agreement. The complaint doesn't even allege that anybody was aware of these teaming agreements in the industry. Again, so different from a kickback scenario, so different from a fictitious company scenario. That's a good point, but let me ask you this. If someone had alleged that, and if we take the allegations in the light most favorable to that plaintiff, why isn't it reasonable for a plaintiff to conclude, well, they've got these teaming agreements, which appear to be legitimate, and that kind of took me off the trail. I didn't have any reason to inquire because these agreements were in place. If I may answer, please. You can reserve that case, that's not this case, because there is no allegation that anybody, let alone the plaintiffs, was aware of these teaming agreements, so we don't present that. Then secondly, I do think that when it comes to sham and Rule 9b, there's just not a plausible argument here that these teaming agreements were a sham. One, Congress wants them. Two, as the plaintiffs themselves acknowledge at paragraph 13 of their complaint, the no recruit provisions in these teaming agreements, they weren't just limited to engineers, they applied to all personnel working on these projects. So it's like this odd reverse bank shot with an agreement that Congress wants that does far more than what the allegations are here, is somehow an attempt to lull people to thinking something when there's not even an allegation that anybody was ever aware of it. So again, if you're thinking about the spectrum of shams, you got false checks, false companies, that's Edmondson. You've got congressionally approved false checks and false companies that the victims were aware of versus what you have here, which is so short of that. And then lastly, I don't know, if I may, I think the law is extremely clear here that the plaintiffs did not seek leave to amend in the ad. Under this court's ACA case, black letter law, they can't ask for leave to amend in the first instance from this court. All right. Thank you very much. Of course. No further questions. Thank you. All right. Your Honor, it's my friend on the other side said a lot. I brought some water to cool yourself down in case you get overheated. I guess I'll start with teaming agreements because it's fresh, but I also want to talk about the Affirmative Act standard, the failure to admit wrongdoing doctrine, and my friend's argument on perpetual tolling. You're not going to spend a lot of time on that teaming agreements, are you? Hopefully not. My friend says Congress wants these agreements, the CFR 48, CFR 9.604, says nothing in this subpart authorizes contractor team arrangements in violation of the antitrust statutes. The defendants knew that they had a multilateral no poach agreement when they adopted these provisions. They adopted narrower no poach agreements that misled class members. They don't have to have misled our plaintiffs in particular, misleading DOJ, regulators, DOD, FTC. In Edmondson, the purpose of the sham entities wasn't to disguise the sham entities from the plaintiffs. They didn't rely on the sham entities. Genuine title could have delivered a bag of money to the lenders in broad daylight, and the plaintiffs would never have known about it. The sham entities are designed to protect the from the government. Also, it simply doesn't follow, even if you concede that teaming agreements are beneficial, it doesn't follow that you can insert a misleading provision into them. The affirmative act standard, I think Judge Wynn was directly on point here. The purpose of Marlinton, Marlinton's key insight is that when you have a secret conspiracy, almost all the time, what you do to carry out that conspiracy overlaps with concealment. Marlinton says this over and over again, that secret conspiracies typically have acts of concealment. They're usually secret. They're generally secret over and over. That sounds awfully close to the self-concealing standard. It does sound awfully close. Rejected. I'm sorry. Which we rejected. Yes. And I think that Marlinton drew a very fine line in the standard. They said, well, like theoretically, as a matter of just kind of abstract reasoning, not every secret price fixing, fixing, or not every price fixing conspiracy has to be concealed. It's not an claim. You can imagine OPEC. OPEC is a price fixing cartel that is not secret. They're not secret because they aren't answerable to U.S. law. Folks who are answerable to U.S. law usually conceal their conspiracy. And they do a lot of things to make sure, like Judge Wynn said, instead of writing it down, they talk about it over the phone. They talk to people in person. So can I ask you about that? Your colleague on the other side said that this complaint is devoid of any of those kinds of allegations. Well, what he said was very clever. He said it's devoid of allegations that anybody instructed anybody to not write it down. And I just don't think that's the only method of concealment. So what does the complaint allege? It alleges that they adopted a gentleman's agreement that they did not write down in order to conceal it from the plaintiffs. It alleges, in particular, it alleges the gentleman's agreement language. But he is arguing that there's no they, who they is. And I think you just say the executives. Sure. And he's saying because of the amount of time that we're looking at, that's problematic that you can't identify who these agreements are between. I just don't think that's the case, Your Honor. I think at the motion to dismiss stage, we take the well-played facts as true. And I think that, you know, let's go to this perpetual tolling kind of argument that I buts this. Marlington rejects this argument out of hand. It gives several well-thought-through reasons. The first is that Congress adopted the Clayton Act statute of limitations against a background assumption that fraudulent concealment doctrine would apply. The second is that it's just nonsense that the statute of limitations would be nullified. There are plenty of antitrust causes of action that don't involve concealment usually. There's mergers to monopoly and interlocking directorates and things like that, where the statute of limitations is a very important kind of element. And finally, it says, you know, that to not allow fraudulent concealment would undermine the purpose of both the statute of limitations. This is Bailey versus Glover 150 years ago, that the statute of limitations is designed to prevent kind of fraud and the kind of taking advantage of lack of information that you're talking about, Judge Benjamin. But to allow concealment to take advantage of the statute of limitations would pervert the purpose of the statute and also pervert the remedial scheme of the antitrust law. And in fact, you know, sure, but then my clients and 20 years of people who have never had a competitive wage in their entire career, in some cases whose social security checks are diminished because they were subject to this conspiracy, never get a chance to recover. And that's not just and shouldn't be allowed. To go to failure to admit wrongdoing, I think the, so my friend cited a number of cases, generally avoided, Marlington and Edmondson, the two most on point precedents in the case body. Failure to admit wrongdoing, at least in the Fourth Circuit, is always a doctrine applied to pretextual answers on inquiry, right? Pocahontas, the failure to admit wrongdoing is the plaintiff asked the defendant, you know, why are you stopping my shipments of coal? And Marlington and Pocahontas point was like, that's not, you're not required to volunteer your conspiracy on that like question. It doesn't apply to any of the other things that he's talking about secret meetings. So if I, if I write down the conspiracy, Judge Wynn, that's not an admission of wrongdoing, right? I'm not admitting to wrongdoing. If I write down the conspiracy, that's Robertson, right? They have, if you'll permit me to finish quickly, the, in Robertson, right? You have these board meetings in which the conspirators write down in the bylaws and minutes of their conspiracy, the allegedly any competitive agreement you know, the, um, in any case, not writing down the conspiracy is not a failure to admit wrongdoing. In this case, it is an act of concealment designed to prevent plaintiffs for recovering for their injuries. Unless you have further questions. Thank you very much. Thank you, Mr. Cobbs. Thank both counsel for their excellent arguments this morning. We'll come down and greet you and move on to our second case.
judges: Albert Diaz, James Andrew Wynn, DeAndrea Gist Benjamin